## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**NATOSHA L. FINLEY,**

       **Plaintiff,**

       **v.**

**MIAMI UNIVERSITY,**

       **Defendant.**

       **Case Nos. 1:19-cv-984**
               **1:20-cv-379**
       **JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This Opinion and Order addresses two motions to dismiss across two related cases: *Finley v. Miami University*, No. 1:19-cv-984 (S.D. Ohio filed Nov. 20, 2019) ("*Finley I*") and *Finley v. Miami University*, No. 1:20-cv-379 (S.D. Ohio filed May 12, 2020) ("*Finley II*"). For the reasons stated more fully below, the Court **GRANTS** Defendant Miami University's ("Miami") Motion to Dismiss (Doc. 9) Plaintiff Natosha L. Finley's ("Finley") First Amended Complaint (Doc. 8) in *Finley I*. In particular, it **DISMISSES WITHOUT PREJUDICE** Finley's state-law claims in *Finley I* for lack of jurisdiction, and it **DISMISSES WITHOUT PREJUDICE** her Title VII claims in that action. As to the Title VII claims, the Court grants Finley 28 days leave to file a second amended complaint addressing the deficiencies identified below, if she can. As for *Finley II*, the Court **GRANTS IN PART** and **DENIES IN PART** Miami's Motion to Dismiss (Doc. 5) Finley's Complaint (Doc. 1). Specifically, the Court **DISMISSES WITHOUT PREJUDICE** Finley's state-law claims in *Finley II* for lack of jurisdiction but **DENIES** the motion to dismiss as to her Title VII claims.

## BACKGROUND

Finley, an African American woman, worked as an Assistant Professor at Miami University, which is a state university in Oxford, Ohio. (*Finley I*, First Am. Compl., ("FAC"), Doc. 8, ¶ 3). Miami hired Finley through a diversity program called the "Heanon Wilkins Faculty Fellows" in 2009 when she was 38 years old. (*Id.* at ¶¶ 7–8). One of the reasons—perhaps the main reason—that Finley applied for the fellowship was because Miami has rare, state-of-the-art equipment that Finley needed to conduct research in her field of structural biology. (*Id.* at ¶¶ 9–12). Specifically, Miami has an 850 Megahertz nuclear-magnetic-resonance spectrometer that Finley hoped to use for her research. (*Id.* at ¶ 11).

After Miami accepted Finley into the program, things started to go downhill. According to Finley, Miami discriminatorily denied her "sufficient access" to the spectrometer, which prevented her from writing "sufficient scholarly articles to meet [Miami's] (shifting) definition" of acceptable performance for promotion and tenure. (*Id.* at ¶ 13). Finley claims that Miami discriminated against her on the basis of race, national origin, and sex because, allegedly, Miami granted only white men sufficient access to the spectrometer. (*Id.* at ¶¶ 27, 32, 37). She also alleges that Miami discriminated against her by holding her to higher standards than to which it held others—namely, individuals who are not African American females. For example, Finley claims that Miami expected her to publish more than these other individuals to earn tenure. And Miami discounted co-authored publications in considering Finley for tenure but did not do the same for these other individuals. (*Id.* at ¶¶ 14–16).

Because Finley had not written enough scholarly articles, Miami denied her tenure on November 4, 2016. (*Id.* at ¶ 16). Miami gave her one extension of time to write more articles, and Finley claims she did exactly that during this extension. (*Id.*). But Miami did not count at least one of Finley's new articles in considering her for tenure again the following year, and, as a result, Miami denied Finely tenure for a second time on December 11, 2017. (*Id.* at ¶ 17). This, in Finley's view, was yet another instance in which Miami exhibited "arbitrary adversity" towards her. (*Id.* at ¶ 16).

Following this second denial, Finley "proceeded to exhaust her appeals" at Miami. (*Id.* at ¶ 18). In January 2018, Finley appealed to Miami's Committee on Faculty Rights and Responsibilities ("R&R Committee"). (*Id.*). The R&R Committee issued a split decision in June 2018 upholding her denial of tenure. (*Id.*). Finley then appealed the R&R Committee's decision to the President's Office. (*Id.* at ¶ 19). But, on November 1, 2018, that office denied her appeal, too. (*Id.*). Finley would go on to file additional appeals with Miami's Campus Office of Equity and Equal Opportunity ("OEEO") and with Miami's Vice President of Institutional Diversity and Inclusion ("Vice President")—all to no avail. The OEEO denied her appeal on November 21, 2018, and the Vice President denied her appeal on February 1, 2019. (*Id.* at ¶¶ 21, 23).

Having exhausted all avenues for appeal at Miami, Finley filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") on April 8, 2019. (*Id.* at ¶ 24). There, she alleged (among other things) that Miami had

unlawfully discriminated against her on the basis of race and sex. (*Finley I*, Compl. Ex. A., Doc. 1-1, #8[1]). The EEOC did not take a position either way on the merits of Finley's charge. Instead, it issued her a right-to-sue letter on September 6, 2019, granting her 90 days from that date to file her claims against Miami in federal or state court. (*Id.* at #11).

Accordingly, Finley filed a Complaint in this Court on November 20, 2019 (within the 90-day window), alleging that Miami had violated her Title VII rights by discriminating against her on the basis of race, national origin, and sex. (*Finley I*, Compl., Doc. 1, ¶¶ 25–34). Miami moved to dismiss that complaint. (*Finley I*, Doc. 4).

Finley then filed a First Amended Complaint. (*Finley I*, FAC, Doc. 8). In the new complaint, she re-alleges her Title VII claims and also adds new state-law claims.[2] As to the latter, she alleges that Miami violated Ohio Revised Code ("O.R.C") Sections 4112.02–.99 in discriminating against her on the basis of race, national origin, and sex. In terms of relief, Finley seeks reinstatement with tenure and back pay, or, in the alternative, at least $5,000,000 in damages for emotional distress, front pay, back pay, and attorney's fees and costs. (*Finley I*, FAC, Doc. 1, #51). Miami filed a Motion to Dismiss (Doc. 9) Finley's First Amended Complaint, too.

---

[1] Refers to PageID Number.

[2] Finley's First Amended Complaint (Doc. 8) in *Finley I* moots Miami's pending Motion to Dismiss (Doc. 4) that Complaint. *Yates v. Applied Performance Techs.*, Inc., 205 F.R.D. 497, 499 (S.D. Ohio 2002) ("Because amended complaints supersede the original pleading, the filing of the amended complaint in this case did technically render the pending motion to dismiss moot."); *accord Polk v. Psychiatric Prof'l Servs., Inc.*, No. 09-CV-799, 2010 WL 1908252, at *2 (S.D. Ohio Mar. 29, 2010), report and recommendation adopted, No. C-1-09-799, 2010 WL 1907586 (S.D. Ohio May 12, 2010). Accordingly, the Court does not address that motion here.

In a separate procedural twist, a few months after Miami filed that Motion, Finley filed another lawsuit against Miami (*Finley II*). The second lawsuit arose from facts that allegedly occurred after Finley filed her original claims against Miami with the EEOC.[3] In *Finley II*, Finley alleges that, from July 2019 until at least November 2019,[4] Miami retaliated against her for filing those claims by (1) excluding Finley from online resources needed to check the balance of her United States Department of Agriculture research grant—an award meant to last through July 31, 2020; (2) terminating that grant and returning the remaining funds to the United States Treasury Department, which prevented her from transferring the grant to another institution and, thus, "crippled her reemployment prospects"; (3) "disrupting credentials" Finley "needed to access her Miami University alumnae account, thus interfering with her communication with Miami associates and former students, further hindering her reemployment search," and (4) "restricting her access to university information systems," which "imped[ed] her ability to apply for

---

[3] Finley seems to allege in her *Finley II* Complaint (though it's not entirely clear) that Miami retaliated against her only after she filed her first federal lawsuit (*Finley I*) against Miami. (*Finley II*, Compl., Doc. 1, at ¶ 7). But to the extent Finley's Complaint could be read that way, it is contradicted by the charge letter she wrote to the EEOC on January 27, 2020 (attached to the Complaint), in which Finley asserted that Miami began retaliating against her as early as July 2019, around three months after she filed her original claims with the EEOC in April 2019. (*Finley II*, Compl. Ex. A, Doc. 1-1, at #7).

[4] Finley alleges in her *Finley II* Complaint that Miami "continues" to retaliate against her. (*Finley II*, Compl., Doc. 1, at ¶ 7). In her January 27, 2020 EEOC charge letter, however, she says that the alleged retaliatory acts occurred from July 2019 to November 2019. (*Finley II.*, Compl. Ex. A, Doc. 1-1, at #7). She likely means that Miami *began* taking these actions between July 2019 and November 2019 and has not changed course since. So, for example, Miami is allegedly still "restricting" Finley's access to university information systems and "disrupting credentials" she needs to access her "alumnae account," (*Finley II*, Compl., Doc. 1, at ¶ 7), though it began taking those actions sometime between July 2019 and November 2019. (*Finley II*, Compl. Ex. A, Doc. 1-1, #7).

reemployment at Miami University in spite of her clear qualifications." (*Finley II*, Compl., Doc. 1, ¶ 7). Finley submitted a charge letter to the EEOC summarizing these alleged acts of retaliation on January 27, 2019. (*Finley II.*, Compl. Ex. A, Doc. 1-1, at #7). Much as it had done with her first set of charges, the EEOC issued Finley a right-to-sue letter on February 19, 2020, and Finley then sued in federal court.

In *Finley II*, Finley alleges that each of the above-described actions constitute unlawful retaliation in violation of her rights under Title VII and O.R.C. §§4112.02–99. (*Id.* at ¶¶ 8–27). Miami has moved to dismiss the claims in *Finley II*, as well. (*Finley II*, Doc. 5). That Motion and Miami's Motion to Dismiss (*Finley I*, Doc. 9) Finley's First Amended Complaint (Doc. 8) in *Finley I* (collectively, "Motions") are now ripe for the Court's decision.

## LAW & ANALYSIS

In both Motions, Miami moves to dismiss Finley's claims on two Federal Rule of Civil Procedure ("Rule") 12(b) grounds. First, Miami moves to dismiss Finley's state-law claims for lack of subject-matter jurisdiction under "Rule 12(b)(1). Miami asserts that the Court lacks power (or "subject matter jurisdiction") to decide her state-law claims. Next, Miami moves to dismiss Finley's VII claims for failure to state a claim under Rule 12(b)(6). Specifically, Miami argues that Finley failed to timely file her Title VII claims with the EEOC under the applicable statute of limitations. The Court addresses each argument in turn.

6

### A.    Finley's State-Law Claims

#### 1.    Legal Standard.

Miami's Motions lodge a Rule 12(b)(1) facial attack on the jurisdictional sufficiency of Finley's state-law claims in *Finley I* and *Finley II*. The Court thus "takes the allegations in the complaint as true, similar to the approach employed in reviewing a Rule 12(b)(6) motion to dismiss." *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 987 (S.D. Ohio 2020) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

#### 2.    The Court Lacks Subject Matter Jurisdiction Over Finley's State-Law Claims in both *Finley I* and *Finley II*.

Both parties (correctly) agree that the Court does not have subject matter jurisdiction over Finley's state-law claims unless Miami agrees to waive its sovereign immunity. That follows from a fundamental precept of our constitutional structure: States cannot be sued in federal court without their consent unless Congress has validly abrogated their sovereign immunity. *Alden v. Maine*, 527 U.S. 706, 713, 756 (1999); *see also Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 681 (6th Cir. 2018). True, Finley's state-law claims are "pendent" claims, meaning that they are only in federal court because they attach to Finley's federal Title VII cause of action. But that does not matter here because "[t]his constitutional bar applies to pendent claims as well." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984). There is no dispute that Miami is a state entity entitled to sovereign immunity. Nor is there any dispute that Congress has not abrogated Ohio's sovereign immunity with respect to any of Finley's state-law claims. Finley attempted to invoke

7

this Court's pendent jurisdiction over these claims anyway, apparently believing that it may be necessary to do so in order to "reserv[e] [her] right to pursue the[m] in an alternative forum." (*Finley I*, Resp. Br, Doc. 10, #63). She also thought there was a chance that Miami might waive its sovereign immunity to "avoid the inconvenience" of litigating these claims in a separate, state-court action. (*Id.*). But Miami has made clear that it is not waiving its sovereign immunity. (*Finley I*, Reply Br., Doc. 11, #64; *Finley II*, Reply Br., Doc. 9, #38). Accordingly, the Court **DISMISSES** all of Finley's state-law claims—meaning, the Court dismisses her state-law claims in both *Finley I* and in *Finley II*—but the dismissal is **WITHOUT PREJUDICE** to Finley's right to file these claims in a forum that has jurisdiction over them. *Carmichael v. City of Cleveland*, 571 F. App'x 426, 435 (6th Cir. 2014) ("Dismissals for lack of jurisdiction based on Eleventh Amendment immunity should be made without prejudice.") (citing *Ernst v. Rising*, 427 F.3d 351, 367 (6th Cir. 2005)).

**B.    Finley's Title VII Claims**

The Court now turns to Finley's remaining claims—her Title VII claims. The Court first addresses Finley's Title VII discrimination claims, which she alleges in *Finley I*. The Court then addresses Finley's Title VII retaliation claims, which she alleges in *Finley II*.

**1.    Legal Standard.**

In both of its Motions, Miami moves to dismiss all of Finley's Title VII claims under Rule 12(b)(6) for failure to state a claim. It is well-settled law that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief

8

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). So, to survive a Rule 12(b)(6) motion, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 545, 547 n.5.

In assessing plausibility, the Court must construe the factual allegations in the complaint in the light most favorable to the plaintiff, accept the well-pled allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. Thus, in reviewing a motion to dismiss, the Court must distinguish between "well-pled factual allegations," which the Court must accept as true, and "naked assertions," which the Court need not accept as true. *See Iqbal*, 556 U.S. at 628 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (alteration and quotation omitted); *see also, e.g., Ctr. for Bio-*

*Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (finding that because some of the plaintiff's factual allegations were "not well-pleaded," "their conclusory nature 'disentitles them to the presumption of truth'") (quoting *Iqbal*, 556 U.S. at 681); *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020) ("[T]he court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events....").

In the discrimination context, a plaintiff is not required to prove a prima facie case to survive a motion to dismiss. *See Swierkiewciz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (noting the Supreme Court "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss"); *Jackson v. Crosset Co.*, 33 F. App'x 761, 762 (6th Cir. 2002) ("[T]he *McDonnell Douglas* framework is an evidentiary standard, not a pleading standard."). In fact, the Supreme Court has rejected the argument that a Title VII complaint is subject to any kind of heightened pleading standard, because this would "too narrowly constric[t] the role of the pleadings." *Swierkiewciz*, 534 U.S. at 511 (alteration original) (quotation omitted). This does not mean that the pleading rules in discrimination cases are any less stringent than pleading standards for other federal causes of action, though, either. *See Smith v. Wrigley Mfg. Co., LLC*, 749 F. App'x 446, 449 (6th Cir. 2018) (noting *Swierkiewciz* "offers no gateway for a plaintiff to side-step the plausibility standard laid out in *Twombly* and *Iqbal*"). Instead, "the ordinary rules for assessing the sufficiency of a complaint apply." *Swierkiewciz*, 534 U.S. at 511.

Moreover, while a plaintiff need not establish a prima facie case at the pleading stage, the elements of a prima facie case are nonetheless aspects to consider when determining the plausibility of a discrimination claim. *See, e.g.*, *Towns v. Memphis/Shelby Cty. Health Dep't.*, No. 17-cv-02626, 2019 WL 639050, at *4 (W.D. Tenn. Jan. 25, 2019), report and recommendation adopted, 2019 WL 639025 (W.D. Tenn. Feb. 14, 2019) ("While a Title VII plaintiff need not establish a *prima facie* case at the motion to dismiss stage, courts have looked to the *prima facie* requirements when determining whether a Title VII plaintiff has pleaded an actionable claim."); *White v. Adena Health Sys.*, No. 2:17-cv-593, 2018 WL 3377087, at *4 (S.D. Ohio July 11, 2018) (discussing the prima facie elements in the context of a motion to dismiss several Title VII claims). Still, the Court must ultimately determine plausibility by employing its "judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## 2. Finley's Title VII Claims in *Finley I* are Time Barred.

Recall that, in *Finley I*, Finley alleges that Miami unlawfully discriminated against her on the basis of race, national origin, and sex, in the process of denying her tenure. Miami does not really try to defend itself on the merits of those claims here—perhaps because that might be an uphill battle at the motion-to-dismiss stage. Miami instead argues that Finley did not file her claims in a timely manner with the EEOC as required by Title VII and that she is thus time-barred from pursuing them in this Court.

Under Title VII, plaintiffs in "deferral state[s]," like Ohio, which have their "own laws prohibiting discrimination in employment," *Amini v. Oberlin Coll.*, 259

11

F.3d 493, 498 (6th Cir. 2001) (quotation omitted), must file a discrimination charge with the EEOC within 300 days of "the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). Otherwise they are time barred from pursuing those claims. *See id.* Miami argues that the last "unlawful employment practice" it allegedly committed against Finley was when it denied her tenure on December 11, 2017. Because Finley did not file her charge with the EEOC until April 8, 2019—493 days later—Miami contends that Finley is time barred from pursuing her Title VII claims. Finley, on the other hand, argues that the clock didn't start ticking until the R&R Committee upheld her denial of tenure in its split decision on some date in June 2018, a date that all agree is within the 300-day window. (Finley never explains why the clock allegedly began to run then instead of after Miami denied her later appeals.)

The Supreme Court's decision in *Delaware State College v. Ricks*, 449 U.S. 250 (1980), provides guidance on selecting between these two proposed trigger dates. In that case, Ricks, a black Liberian, had been teaching at Delaware State College for approximately three years when the college's tenure committee recommended that he not receive tenure. *Id.* at 252. The tenure committee agreed to reconsider its decision a year later, which it did, adhering to its original recommendation. *Id.* In the following month, the faculty senate voted to support the tenure committee's recommendation, and, later, "the College Board of Trustees formally voted to deny tenure to Ricks." *Id.* Dismayed with this decision, Ricks immediately filed a grievance with the Board's grievance committee, which held a hearing and took the matter under submission. *Id.* While his grievance was pending, the college offered Ricks a 1-

year "terminal" contract, which Ricks accepted. *Id.* at 254. Shortly thereafter, the Board notified Ricks that it had denied his grievance. *Id.* Ricks later filed an employment-discrimination charge with the EEOC, which eventually issued him a "right to sue letter." *Id.*

Ricks then turned to federal court, alleging "that the College had discriminated against him on the basis of his national origin in violation of Title VII and 42 U.S.C. § 1981." *Id.* The district court granted Delaware State's motion to dismiss both claims as untimely. *Id.* It concluded that the only unlawful employment practice that Ricks alleged was the college's decision to deny Ricks' tenure, and that the limitations periods for both claims began to run at the latest when the president of the Board notified Ricks that he would be offered a 1-year "terminal" contract ("terminal-contract-letter date"). *Id.* at 255. And that date fell outside the 180 days that Ricks had to file his charge with the EEOC. The Third Circuit reversed, holding that the limitations periods did not begin to run until Ricks's "terminal" contract expired, which fell within the 180-day window. *Id.*

The Supreme Court, after granting certiorari, agreed with the district court and reversed the Third Circuit. *Id.* at 256. In so holding, the Court explained that determining the timeliness of an EEOC complaint requires a court to "identify precisely the 'unlawful employment practice' of which [the plaintiff] complains." *Id.* at 257 (quoting 42 U.S.C. § 2000e–5(e)(1)). "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* In tenure-discrimination cases, this means that the limitations

13

period generally begins to run "when the tenure decision is made and the plaintiff is notified." *Id.* at 259 (alterations omitted). The Court also described this as the date that the college "establishe[s] its official position—and makes that apparent to [the plaintiff]." *Id.* at 262. Thus, reasoned the Court, the district court was justified in concluding that the limitations period began no later than when the Board's president notified Ricks that the college would be offering him a 1-year terminal contract (the "terminal-contract-letter date"). *Id.* The Court's reasoning also strongly suggested that the limitations period had begun even earlier, when the Board formally voted to deny tenure to Ricks, prompting Rick to file a grievance with the grievance committee. But the Court expressly withheld "decid[ing] whether the District Court correctly focused on the [terminal-contract-letter date], rather than the date the Board communicated to Ricks its unfavorable tenure decision made at the [formal-vote date]." *Id.* at 262 n.17. Why? Because it didn't matter. Even counting from the terminal-contract-letter date, Ricks had waited too long to file his charge with the EEOC.

Turning to the instant case, *Ricks* implies that the limitations period for Finley's Title VII discrimination claims began to run, at the latest, on December 11, 2017. That was the day that Miami made its final tenure decision after offering Finley one extension of time to write more articles. And it was *that* decision from which she appealed.

Finley would prefer a later date—the date the R&R Committee upheld the Board's initial tenure decision. That might be conceivable, but for the fact that the

14

Supreme Court shot down that exact argument in *Ricks*. More specifically, in an amicus brief in *Ricks*, the EEOC argued that the limitations period should not have begun until the date that the Board notified Ricks that his grievance had been denied. But the Court rejected the notion that the Board's earlier vote "was only an expression of intent that did not become final until the grievance was denied." *Id.* at 260. This was so even though the terminal-contract letter held out "the possibility that he would receive tenure if the Board sustained his grievance." *Id*. The Court explained that "entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." *Id*. That logic should make sense to anyone familiar with the final-judgment rule under 28 U.S.C. § 1291. Just because a decision is appealable does *not* mean it is *not* final. In general, under the final judgment rule, the only federal-court orders that are appealable are *final* court orders. *See id.*

The Supreme Court also rejected any argument that "the pendency of the grievance should toll the running of the limitations periods." *Ricks*, 449 U.S. at 260–61. The Court noted that it had "already held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Id.* at 261 (citing *Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976)). "The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made." *Id.*

15

Following *Ricks*, the Sixth Circuit has concluded that "in cases involving tenure denials, courts should apply the date the plaintiff was notified of the tenure denial, and not the date marking the end of the grievance (i.e. administrative appeal) process." *Haeberle v. Univ. of Louisville*, 90 F. App'x 895, 898 (6th Cir. 2004). Indeed, in *Haeberle*, the court noted that the fact that the plaintiff had "appealed his denial of tenure," *id.* (quoting the complaint), itself meant that the university "*must* have notified" the plaintiff of its final decision before that date. *Id.* Other circuits have also reaffirmed that "when a challenged employment decision is merely subject to later review, reconsideration, or appeal, this does nothing to stop the clock from running." *Almond v. Unified Sch. Dist., No. 501*, 665 F.3d 1174, 1179 (10th Cir. 2011) (Gorsuch, J.) "The limitations period still accrues with the employer's announcement…." *Id.*; *see also Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 288 (5th Cir. 2008) ("[T]he Supreme Court was clear in *Ricks* that grievance procedures, no matter the outcome therein, do not alter the date that the limitations period begins to run.").

Finley did not allege in her First Amended Complaint (plausibly or otherwise) that Miami's decision to deny her tenure on December 11, 2017, was anything other than a final decision—at least unless and until overturned on appeal. She does not allege, for example, that her appeal to the R&R Committee was an attempt to "influence" a decision that had yet to be made. *Ricks*, 449 U.S. at 261. Nor does she allege that the decision was "in any respect tentative," *id.*, other than that it might have been overturned on appeal, which (per *Ricks* and its progeny) doesn't affect the analysis.

In her response brief, however, Finley now argues that the December 11, 2017 decision "was not fully completed until the required review by the [R&R] Committee." (*Finley I*, Resp. Br., Doc. 9, #62). (This is also the first time she suggests that the R&R Committee review was "required"). She describes her appeal to the R&R Committee as "the continuation to its conclusion of the determination of whether an adverse decision would be made at all." (*Id.*). She claims that "she merely followed the process to get a final determination" from the R&R Committee. (*Id.*).

These arguments have a procedural problem and a substantive problem. The procedural problem is that Finley asserts them in a response brief and not in her First Amended Complaint. So the Court cannot consider them in deciding whether to grant Miami's Motion to Dismiss. *See Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 502 Fed. Appx. 523, 541–42 (6th Cir. 2012). But Finley also has a substantive problem. Even if she had made these claims in her First Amended Complaint, the Court is skeptical that they would survive Miami's Motion to Dismiss.

True, the Court must construe Finley's factual allegations in her complaint in the light most favorable to her. But the Court is not required to accept "[c]onclusory allegations … masquerading as factual allegations." *Eidson*, 510 F.3d at 634. So the Court need not accept that a seemingly final decision (subject to appeal) is tentative merely because Finley labels it as such. If something, in fact, made the decision tentative (other than the fact that it could be appealed), Finley can (and must) *clearly* allege so in her complaint. For the Sixth Circuit has said that even "employment decisions which are 'somewhat *ambiguous* with respect to … finality' still trigger the

17

statute of limitations." *Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir. 1987) (alteration original) (emphasis added) (quoting *Kessler v. Board of Regents*, 738 F.2d 751, 755 (6th Cir. 1984).

Ironically, Finley appears to have abandoned an argument that she hinted at in her First Amended Complaint, where she alleges that each of her denied appeals was a new act of discrimination. For whatever reason, Finley does not now argue that any of the denials (aside from the R&R Committee denial) reset the limitations period, which (if true) would make her claims timely. Even if she had made that argument, however, the Court would not agree. To be sure, *Ricks* suggested that discriminatory conduct that occurs after the tenure decision could reset the limitations period (a point to which the Court returns in its discussion of *Finley II* below). But, to take advantage of that principle, a plaintiff must identify how "the manner in which" she was treated "differed discriminatorily from the manner in which" the college treated others who were similarly situated. *Ricks*, 449 U.S. at 258. Finley does no such thing in her Complaint or accompanying attachments. Yet again, she offers nothing more than "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 628. She merely asserts that each adverse decision and alleged failure of process in her appeals constituted discriminatory treatment. She does *not* explain how "the manner in which" she was treated "differed discriminatorily from the manner in which" Miami treated others who were similarly situated. *Ricks*, 449 U.S. at 258.

All of that said, it is perhaps possible that she can plausibly make such allegations, but simply has failed to do so. Accordingly, the Court **DISMISSES** Finley's Title VII claims in *Finley I* **WITHOUT PREJUDICE**. And it provides Finley 28 days leave to file a second amended complaint plausibly alleging (if she can) that Miami's December 11, 2017 decision denying her tenure was not a "final decision," such that some later decision constituted the triggering event, or that Miami made some later decision in a discriminatory manner that can serve as the basis for her Title VII claim. In doing so, the Court cautions Finley that her allegations in that regard, should she choose to make them, must be *plausible*. As to the final decision issue, for example, she must identify some fact—e.g., a faculty manual provision, a university rule, or something—that plausibly suggests that tenure decisions are not "final" until the completion of some particular event in the university review process. And that event must have occurred within 300 days of the time that she filed her initial complaint with the EEOC.

### 3. Finley's Title VII Claims in *Finley II* are *Not* Time Barred.

That leaves Finley's Title VII Claims in *Finley II*. As noted earlier, these are retaliation claims based on facts that allegedly occurred after she filed her original claims of discrimination against Miami with the EEOC.

More specifically, Finley alleges that, in retaliation for Finley filing her original discrimination claims against Miami with the EEOC and the Court, Miami: (1) excluded Finley from online resources needed to check the balance of her United States Department of Agriculture research grant—an award meant to last through

July 31, 2020; (2) terminated that grant and returned the remaining funds to the United States Treasury Department, which prevented her from transferring the grant to another institution and, thus, "crippled her reemployment prospects"; (3) "disrupt[ed] credentials" Finley "needed to access her Miami University alumnae account, thus interfering with her communication with Miami associates and former students, further hindering her reemployment search," and (4) "restrict[ed] her access to university information systems," which "imped[ed] her ability to apply for reemployment at Miami University in spite of her clear qualifications." (*Finley II*, Compl., Doc. 1, ¶7). Miami allegedly took these actions sometime between July 2019 and November 2019, and Finley complained about them to the EEOC in a charge letter she submitted to the agency on January 27, 2020. (*Finley II*, Compl. Ex. A, Doc. 1-1, #7).

Title VII "protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Absent direct evidence of retaliation (Finley does not suggest she has any), the prima facie elements of a Title VII retaliation claim here are: (1) Finley engaged in Title VII protected activity; (2) Miami knew she had exercised her protected rights; (3) Miami thereafter took an action that was materially adverse to her; and (4) there was a causal link between the protected activity and the adverse action. *Barrow v. City of Cleveland*, 773 F. App'x 254, 261 (6th Cir. 2019)*; see also Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568–70 (6th Cir. 2019). Importantly, the last prong requires but-for causation,

"meaning the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Barrow*, 773 F. App'x at 261 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

As noted above, a plaintiff is not required to establish a prima facie case at the pleading stage. At that same time, of particular import here, while the Sixth Circuit has noted that the standard for pleading causation in a retaliatory discharge case is "minimal," the plaintiff must "put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citation omitted).

Miami does not dispute that Finley satisfies the first three elements of a prima facie Title VII retaliation. It would be hard for Miami to contend otherwise: (1) Finley engaged in Title VII protected activity when she reported her discrimination claims to Miami, the EEOC, and when she filed suit in this Court. *See Hubbell*, 933 F.3d at 569 (6th Cir. 2019); (2) Miami knew Finley engaged in these protected rights; after all, she filed discrimination complaints at Miami and sued Miami in federal court; and (3) Miami thereafter took materially adverse action against her when it (allegedly) terminated her grant and restricted her access to certain resources, thereby "crippl[ing]" her re-employment prospects.

The only question that remains is whether Finley has plausibly alleged that there was a causal connection between the protected activity and the adverse action.

At this stage of the litigation, Finley "need only set forth minimal facts plausibly alleging that this is the case." *Sizemore v. Edgewood Bd. of Educ.*, No. 1:19-CV-555, 2020 WL 1904726, at *8 (S.D. Ohio Apr. 17, 2020) (citing *Dixon*, 481 F.3d at 333). That is, she "must put forth some fact creating an inference that the adverse action would not have occurred without the employee first engaging in protected activity." *Id.*

Finley has met that standard here, if barely. Her Complaint is unfortunately not as clear as it could be about the timing of the materially adverse actions. But in her letter to the EEOC (attached as an exhibit to her *Finley II* Complaint), where she complained of these new retaliatory actions, she reported that they began in July 2019—roughly three months after she filed her original claims against Miami with the EEOC. (*Finley II*, Ex. A, Doc. 1-1, #7). That is enough to nudge her claims over the line at the pleading stage, but not by much. *See Sizemore*, No. 1:19-CV-555, 2020 WL 1904726, at *8 (S.D. Ohio Apr. 17, 2020) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The Court is thus satisfied that Finley has alleged enough facts, when the allegations are construed in her favor (as they must be at this stage), to at least create a plausible inference that Miami would not have taken the alleged actions had she not exercised her Title VII rights.

Miami appears to contest this causal connection (or lack thereof) between its actions and Finley's protected activity, but it styles its challenge as an attack on the timeliness of Finley claims. Miami contends that each of the alleged retaliatory actions was a "natural and inevitable consequence[] of Miami's decision to deny

[Finley] tenure and not a new claim." (*Finley II*, Mot. to Dismiss, Doc. 5, #19). Because these actions are the "natural and inevitable consequence[]" of Miami's earlier decision, Miami argues, Finley is time barred from bringing these claims, too. (*See id.* at #20, relying on *Ricks*, 449 U.S. at 257, *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981), and *Janikowski v. Bendix.*, 823 F.2d 945, 947–48 (6th Cir. 1987)).

The problem with this argument is that it depends on the Court assuming that each of Miami's allegedly retaliatory actions were not, in fact, retaliatory. In other words, the argument requires the Court to assume that Miami necessarily would have taken each of these actions simply because it denied Finley tenure, or, said another way, that Miami would have taken these actions based on that denial *whether Finley had complained about discrimination or not*. It is difficult to see at this stage in the litigation how the Court could reach that conclusion. Certainly, the Court can't credit Miami's factual assertions in its Motion over the well-pled allegations in Finley's Complaint. *Ricks*, *Chardon*, and *Janikowski* are not to the contrary. In none of those cases did the plaintiff plausibly plead new, retaliatory conduct that occurred after the initial discriminatory decision. Rather, those cases stand for a proposition that Finley does not call into question here: that "mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Ricks*, 449 U.S. at 257; *accord Chardon*, 454 U.S. at 8; *Janikowski*, 823 F.2d at 945.[5]

---

[5] In *Janikowski*, the court held that the plaintiff's federal claims were untimely because the plaintiff filed those claims outside the limitations period, which began to run at the time he received notice of his eventual termination. 823 F.2d at 947. The plaintiff's state-law claims, however, were timely, but only because, under Michigan law, the limitations period for those

To be sure, the Court can certainly imagine how each of the alleged retaliatory acts *was* the inevitable consequence of Miami denying Finley tenure and ultimately terminating her employment. For example, Finley complains that the University took action to terminate her grant funding. But it may well be the case that closing the grant was a necessary consequence of the school's decision to deny her tenure, particularly if that meant that she would necessarily be leaving the institution. The National Science Foundation, as an example, has a policy that "[w]hen a PI/PD plans to leave an organization during the course of a grant, the organization has the prerogative to … request that the grant be terminated and closed out." *Grant Administration*, National Science Foundation, (Nov. 28, 2020, 7:13 AM), https://www.nsf.gov/pubs/policydocs/pappg18_1/pappg_7.jsp. To be sure, Finley alleges that her funding came from the United States Department of Agriculture, which may or may not have a similar policy. But the point is merely that the de-funding may have been an inevitable consequence of the decision denying Finley tenure, in which case it would not amount to retaliation. *See Ricks*, 449 U.S. at 257, *Chardon*, 454 U.S. at 8, and *Janikowski*, 823 F.2d at 947–48. At this stage, though, Miami has not pointed the Court to any statutory or regulatory provisions showing that is the case. And, absent that, the Court has no basis to reject—at the pleading stage—Finley's allegation that this conduct was undertaken in retaliation for her reporting of Miami's allegedly discriminatory conduct.

---

claims did not begin to run until the date the plaintiff's employment was terminated. *Id.* at 951.

Because the Court cannot determine at this stage whether Miami's allegedly retaliatory actions were the necessary and inevitable result of denying Finley tenure (such that they were not themselves discriminatory, but rather the consequences of the allegedly discriminatory decision on tenure and thus untimely), or instead may have been voluntarily undertaken in retaliation for her having asserted claims of discrimination (which, if true, would make them new discriminatory acts), the Court **DENIES** Miami's Motion to Dismiss Finley's Title VII claims in *Finley II*.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant Miami University's Motion to Dismiss (Doc. 9) Plaintiff Natosha L. Finley's First Amended Complaint (Doc. 8) in *Finley I*. More specifically, the Court **DISMISSES WITHOUT PREJUDICE** Finley's state-law claims for lack of jurisdiction. It also **DISMISSES WITHOUT PREJUDICE** Finley's Title VII claims in *Finley I*, and grants her 28 days leave to file a second amended complaint in that case addressing the deficiencies identified above, if she can do so. In addition, the Court **GRANTS IN PART** and **DENIES IN PART** Miami's Motion to Dismiss (Doc. 5) Finley's sole Complaint (Doc. 1) in *Finley II*. In particular, the Court **DISMISSES WITHOUT PREJUDICE** Finley's state-law claims in *Finley II* for lack of jurisdiction, but **DENIES** the motion to dismiss as to Finley's Title VII retaliation claims.

**SO ORDERED.**

_November 30, 2020_
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

25